Oral argument in Clark-Nowak v. Clark County. Oral argument in Clark-Nowak v. Clark County. Good morning, Your Honors. May it please the Court. My name is Lee Rowland. I am here representing the plaintiff's appellants in this case. Also at council table is Alan Lichtenstein, General Counsel of the ACLU of Nevada. I will endeavor to save myself a minute for rebuttal. We are here appealing the grant. It's good to see the ACLU representing the officers. We are representing the officers, without any question. We're here appealing a grant of summary judgment at the district court. We have argued that the district court relied on two areas of law in its determination. The first was that he held as a per se matter of law that the covert surveillance of a single-sex locker room with restricted access by an electronic keypad could not have an expectation of privacy simply because more than one person was present in the room. We believe that Ninth Circuit precedent amply demonstrates that that is not a correct application of the expectation of privacy analysis. The second conclusion of law made by the district court was based on the defendant appellee's argument that in order to find Monell liability, there had to be a longstanding custom in practice, in this case, the covert video surveillance. Again, we believe that there is ample precedent to demonstrate this. Let me just talk a little bit about the facts, just so I have the facts straight in my mind. No tapes have been found, yes? That is correct. The tapes have not been traced. Disagree with me if I get it wrong, so I'm just going to make sure I understand. And there's no evidence that anybody has tapes. This is not a case where tapes were put on the Internet or no, I'm just, there's no, in fact, we don't have any evidence at all that anybody ever saw any naked guy. I mean, that's what you're worried about. There is quite a bit of evidence from which we have argued a reasonable jury could determine that people were indeed videotaped. The problem, of course, in the case is that the best evidence, the videotapes, were not produced by the defendants. You're already answering a question I'm not asking. Okay. Okay. I just haven't gotten there. I just want to take it one step at a time. You don't have any evidence that anybody has actually seen any naked guys, which, or guys in lockers, whatever it is that you're worried about, the invasion of privacy. There is evidence that people have seen folks on the tape. The chief in this case, Broderick at his deposition, did testify that he saw at least two individuals, one of whom, as we have included in the record, he surmised the identity of, but did not disclose that during his deposition. Those are factual issues which we believe. Was he indicating they were, how shall I put it, disrobed? I'm just trying to gauge the nature of the intrusion here that you're claiming. You are not claiming, I don't think, that let's say the camera had been in a part of the locker room where people walk in and out with their gym bags and all that, but they're fully dressed. You wouldn't be claiming the intrusion there, right? Unlikely, Your Honor. It is established on a quid pro quo. It has to be some sort of, there has to be some proof that these folks were caught in an appearance, in a way, naked or something, that you would only do in a locker room, that you wouldn't do if you knew that. Is that right? I believe you're asking two separate questions. First of all is whether or not they had the reasonable expectation of privacy in that room. The court held as a per se rule, as I said, that they could not, so it didn't quite reach whether or not that was subjectively reasonable. We would argue yes, absolutely, based on cases like Trujillo and Bonnell, that number one, there was an expectation of privacy because the purpose of this room was set aside for those police to be in various stages of undress. However, I do not think that whether or not one was seen nude or in a various stage of undress on the camera is dispositive to the issue of the intrusion. I would point to a case like Bonnell where the private activity in that room was gambling. Certainly, again, I don't think there was any indicator that it was, you know, strip poker. They don't have to be in a stage of undress in order for private activity to go on. There is also indication. But being seen in the antechamber of a bordello would be damaging, even though you might be there perfectly dressed. But there's nothing, you know, just because you're being caught in a place where reputable people don't go. Correct. But there's nothing disreputable about being in a locker room. It's not about disrepute. Every man and probably most women have at one point or another a locker room. Again, they don't have to be nude in order to have an expectation of privacy. The Fourth Amendment protects people, not places. There's ample precedent, which we have quoted, that is when you endeavor to create a private space, that's clearly what has happened here. But just being in a locker room is not in any sense damaging. No, not per se. And being caught on camera being dressed in a locker room or being seen, observed, isn't a violation, right? We believe that it is if private activities were captured. There is a deposition testimony, for instance, that says the officers believed that one of the evidentiary reasons they were on tape is because the police clearly knew their union activities. Let me follow up on the point that Judge Kuczynski is getting at. Where is the evidence that your clients were aggrieved by surveillance? That they were, I'm sorry? Aggrieved by being surveilled. They were, for instance, the one I just mentioned, which is in deposition, that they testified they believed their union activities were being monitored. They also believed that their superiors saw them. But what's the basis for that belief? What's the evidence in the record? The basis for that belief, first of all, there is. That your clients were actually taped. There is quite a bit of evidence. Okay, go ahead. Number one, there is a factual discrepancy as to how long the tape was up, which we believe precludes summary judgment. The scope and the duration of the actual intrusion is clearly relevant to the analysis here. The reason I mention that is because I think over a course of several years, which is what the plaintiffs in this case have testified during deposition, they found the camera years later. These were gentlemen who were in that locker room every single day in various stages of undress. What I'm trying to find out is what's the evidence that the camera was active when your clients were employed? That they found a running VCR when they went into the closet. Again, that's in the deposition testimony in the record before you. This was years after the installation. And we know for a fact that the chief viewed at least two of those tapes, saw at least two people on those tapes, and he admitted in deposition he had not seen the rest of the tapes, had no idea where they were or who had seen them. Was the VCR connected to the camera in the locker room? Is there evidence to establish that? At this point, I don't think that's been proven. It is still an open issue. There has not been one evidentiary hearing in this case. The judge went ahead and made, again, what we believe are clearly erroneous legal holdings without getting into those evidentiary issues. I realize that the evidence here is not ideal, but given the fact that the defendants have not produced the crucial piece of evidence in this case, I believe it would be it would create perverse incentives for destruction of evidence if they were unable to profit off of that by saying we do not have standing or we don't have an intrusion because magically the best evidence has not turned up in the case. So we believe that a jury is entitled to hear the facts, and there are quite a few, many of which I've just mentioned, that may establish that over the course of years the first gentlemen who were in that room every day in various stages of undress were likely caught on tape and likely monitored by someone. Those facts are still in dispute in the case. Was there any ñ would this be a videotape with audio or just a camera? This videotape did not have audio. I think under this court precedent, it's irrelevant. So union activities, the union activities argument is pretty weak. You can see a bunch of guys huddled around talking. They might be talking about striking, but very likely they're talking about the baseball game last night, right? I mean, this ñ That is possible. I mean, it's ñ I think there are two separate issues. That we know for a fact under deposition is what led them to believe they were being taped in part because they were talking about unionizing. It was in part due to the patterns of individuals. Will you permit me to reserve the rest of my time for rebuttal? Sure. Yes. Thank you. You may please report. My name is Eva Garcia Mendoza, and sitting at counsel table with me is Carolyn Campbell, Deputy District Attorney. We both represent Clark County. First, as your honors well know, the only defendant in this action is Clark County. There is no individually named defendant. And there is no respondee at superior liability under a Monell cause of action. What we have here is that ñ Well, but, you know, if you ñ if you have a camera that's wired in a locker room ñ I mean, this is not a Mickey Mouse operation. This was something ñ I mean, if you believe the complaint, this was something that had to have been put in with approval of management, or at least that's a fair inference. And I don't understand why they can't ñ assuming they can prove a ñ or they've made a case for a constitutional violation to begin with, I don't see what stands in the way of a Monell claim for actual ñ at least where they at least get discovery as to whether or not the sheriff or ñ I'm sorry, this was sheriff, right? No, this is the chief, park chief, park police chief. But let me ñ let me describe the ñ Whoever the chief was, the ñ This is not a police department like the Metropolitan Police Department of Las Vegas. This is a little unit whose only jurisdiction is to police the parks in Clark County. They're law enforcement officers. They're ñ they're type 2 peace officers. They're not full law enforcement officers. And so although he had the title of chief, chief Broderick, he just was over a little unit. He had a supervisor who was a department head. There are lots of departments within Clark County. Clark County is governed ñ Well, at what level would the approval have to be given for the surveillance for you to concede that there's a valid Monell claim? I mean, let's ñ Let's say you go to the board of supervisors and the board of supervisors says, yes, you've got a problem with theft. You go ahead and put it in camera. Would that ñ would that be enough to establish a Monell claim? Absolutely, Your Honor, because the prong in Monetti says that the decision-making official ñ Okay. Okay. Let's say he didn't do that. Let's say we go one. What's one ñ who stands behind the chief and the board of supervisors? Two people, Your Honor. Okay. And who are they? The county manager, who is the chief executive officer who acts according to whatever is ñ So let's say he didn't go to the board of supervisors. Let's say he talked to the county manager and said, I have a problem with theft in my locker room. I'd like to put it in camera. And the city manager said, yes, go ahead and do it. Monell? Yes. Okay. Who's next on the food chain? The department head. Okay. How about him? He is not a final policymaker. Okay. So he wouldn't count, but the city manager would. Correct. But the chief here was the final policymaker in terms of making the decision to install the camera. No. Who made the decision? He ñ the chief said that he talked to internal affairs or one of his ñ his sergeant or something  who's a boob and can we install a camera? And they said, well, you've got some concerns with Fourth Amendment privacy. And so then he went over to the deputy district attorney. He also went over to someone in the human resources department. And they said, well, if you want to install the camera, you have to install it within these very limited parameters. And the parameter was that it's only going to be focused on the locker and only for a very limited period of time. So it wasn't focused like the Trujillo case that was panning the whole locker. Well, my point is that the chief was the final policymaker in terms of making the decision to install the camera. I understand he sought some legal input, but he was the person who decided that the camera should be placed. Well, but you ñ but that doesn't become a policy. That just makes a decision that, yes, I want to install this. Well, maybe we ought to think about that because I understand the Ninth Circuit has a case, Lytle v. Carl. And in that case it says a policy includes within its definition not only policy in the ordinary sense of a rule or practice applicable in many situations. It also includes, and I quote, a course of action tailored to a particular situation and not intended to control decisions in later situations. Why is this not a policy? Well, Your Honor, because if you look at Monell and you look at Manetti, it doesn't say that. Manetti specifically says it's got to be a standard operating procedure of Clark County, not just of this little bitty unit within Clark County. They don't set policy, this little bitty unit, for all of Clark County. And this was a one-time occurrence. That's a very good argument when you argue this case in Bank. But Judge Smith asked you about the Ninth Circuit opinion. And you understand how these things work. We are the panel of the Ninth Circuit. We are bound by the law of the Ninth Circuit as announced by other panels. So just arguing that the case is wrong will waste your time, but yet you're not at all ahead. Why don't you answer Judge Smith's question on the assumption that the case to which she refers is the gospel truth, you know, is the law? Well, let's assume that this was a wrongful search, okay? We still have that issue of standing that you addressed with counsel for the plaintiffs that where's the beef? Who was seen in the stage of undress? Well, I don't want to distract you from answering Judge Smith's question. If your answer is yes, we lose on that issue, then we can go ahead and talk about something else. And that's what I'll say. I'll concede. Okay. That's fine. So we don't know who saw the tapes. For all we know, there is a Bursk Market out there with tapes of police officers in the locker room in the state of undress. I don't know. How will they find out without discovery on this point? Well, we had three years of discovery, and it never came up. And that's what they said and the plaintiffs said in their brief below before Judge Mahan. It says, So you're saying no damage or you're saying no injury? No injury and no standing because in all of the cases that this court has had before concerning video surveillance, and I'll take, for example, the older case of Takeda versus U.S. In that one, the court, there was a video surveillance, and there were two police officers that were plaintiffs. And the court said the only reason that we're going to be in favor of this one particular plaintiff, because it wasn't his office that was surveilled, but he came in and he walked and he was seen coming into this office that did not belong to him. And the court in Takeda, this court, said because he was seen in that videotape, then he has standing and we're going to suppress the evidence. Here, no one was seen. The only person that saw it said he may have seen two people's backs, couldn't identify them, they were dressed, and the camera was focused from the waist up. Did you raise standing as a ground of appeal? No, Your Honor. And we didn't raise the standing as a ground of appeal in the court below, you mean? Yes, both. Both. I mean, I looked for that, and I didn't find it. We raised it in the sense that the plaintiffs below did not refute and conceded that there was no search. They conceded that there was no unlawful search. And so we didn't have an opportunity to raise it. It wasn't raised until it came to this Court, Your Honor. And that was after the appeal was filed and you raised it? No. They raised that there was a wrongful search for the first time on appeal. And so we said, look, you're not entitled to raise that issue under Patrin, but if the Court wants to consider it, then it wasn't a wrongful search. You know, you do concede, do you not, that this Court heard that it held that there was no privacy interest here because it was a place where other people were present? The district court made two findings. First, he said that there was no expectation of privacy in the locker room. And then he asked the Plaintiffs' Counsel to address the issue of Monell. And all they said was, we believe that Broderick was a final decision-making. But under the law, it has to be the final decision-making as a matter of State law. Did you hear my question? I think I did. I thought I was answering it. Well, it didn't sound to me like you were answering it. Okay. Do you remember what the question is? You asked whether Judge Mahan addressed these issues below. No, I don't think I did. I said, you do concede, and just listen carefully now. Don't talk. Listen. You do concede that the district court erred in finding there was no reasonable expectation of privacy in the locker room because other people were present. Today, yes, because last month, this Court decided in the case of Trujillo that videotape in a locker room. Just for the record. Yes. At that time, that was not the law. When I ask a question like that, I'm talking about today. Today, yes. I'm not talking about 1964 or 1898 or anything like that. I'm talking about today. Today under the law. So you do concede that the district court erred. Yes. And, in fact, it was a pretty silly ruling in a way, wasn't it? I mean, you know, you have gang showers, right, in a lot of locker rooms. I think they still do. And where men, I don't know about women, but men shower together and undress in front of each other. But that's not considered to be a place where you have, I mean, people do expect to have privacy from people of opposite sex, for example. You do concede that. Of course. So the rationale that, oh, because the other guy is present, you know, this is a public place, that really has never been the law, right? It's not. It isn't today. It wasn't last month. It wasn't the months before that. You're correct, Your Honor. Okay. So what do we do with that? The district court really goofed on that one. I'm sorry? The district court really goofed on that one. Well, no, because the district court said, look, there's no evidence that anyone was videotaped doing anything private. There's no evidence that anybody was videotaped in a state of undress. No, the district court said it had two grounds for the decision. One was a Monell ground, which is questionable, and the other one is the no expectation of privacy ground, which is wrong. So there's really no way we can affirm this, right? I mean, there may have been other things in the record, but certainly none that the district court ruled on. No, I think that Your Honor can affirm on the Monell. Definitely you can affirm on the Monell. But you already conceded in response to the Judge Smith question that you gave up that one. You said, no, the district court is wrong. No, the issue of the ---- You remember Judge Smith's question, and I said I don't want to distract you from answering it unless you want to say, look, okay, we give up, that's wrong. And the question Judge Smith asked is we have a case, she cited to you, that says that the policy can be a spot policy. It doesn't have to be a policy that applies to everybody. It can be just a policy that applies to a single situation. And you seem to say, yes, that's the case. No, I don't believe I said that's the case. I said it can't be a spot policy because every single act that you do throughout the day, then it's going to become policy. That's not the law. It can't be. Well, I don't believe so, Your Honor. Okay. Thank you. All right. You have a minute or so for rebuttal. Thank you, Your Honors. I think I would just sum up by saying that, unfortunately, we've been put in a position where standing is to some degree a factual issue in this case. And while the district court did not issue any factual findings, he did issue legal findings implying that he found standing. I think there should be some deference to that decision. But counsel, I thought counsel was pretty accurate in the things that your client or their attorneys stipulated to in the court below as to facts that were stipulated as they went in. And then coming on appeal, you allege a cause of action, if you will, or an appellate issue, that then they finally have to say, well, based on what you stipulated to in the district court, it isn't unusual that we would now have to argue about standing. That was her response. And the reason it wasn't a ground on appeal necessarily is because you appealed it, but given that you're going to talk about now expectation of privacy, we ought to have standing to get it. I think that's a fair ---- How to respond to that. I think it's a very ---- If you stipulate a way in the district court and you don't have the standing on actuality, then how do I get around it? We didn't stipulate that we didn't have standing. We stipulated that there's no tape. It has not been produced. We have, however, repeatedly argued that there are ample facts, which we have never waived, that a reasonable jury could find that those folks were indeed videotaped based on their presence there every day and the ongoing videotaping for years. There is, unfortunately, discrepancy in the testimony. Well, let me clarify this factually. Let's say, hypothetically, that what was going on here, they had two tapes, and they would, during the day they would put in one tape and it would run, and then at night somebody would come, take out the tape, watch it, put in the other tape, watch the other tape, and tape over. So you basically have two tapes, one that they put in every day, somebody would watch it at night, and then they'd tape over it the next day. Your position would be what, that even though the tape existed and was erased, the fact that somebody saw it was a invasion of privacy? I think that's a much trickier case. First, I think offhand I'm hesitant to say that it would or would not be an invasion. It would depend on who had seen it and what was on the tape. What we know as a matter of fact in this case is that there were numerous tapes, only two of which the chief reviewed, and he admitted in deposition that other people had the tapes. He didn't know who. He didn't know how many people had seen them. Those are undisputed facts. This is not a situation where we have two tapes, they were both reviewed in their entirety, and that was it. There are tapes that are out in the ether here, and therefore we, I go back to my original point, we are in the uncomfortable position of having to put the issue of standing and publication of those tapes before a jury because that evidence has not been produced. And I would argue again that to permit the defendants to profit off of non-production of the crucial discovery issue in this case would give future defendants an incentive to destroy electronic data if the per se holding is that if you destroy the intrusion at issue, therefore we have no standing. That clearly would insulate a great number of problematic constitutional decisions from review, and I think this case is a very good example of that. We know that people saw these tapes. We don't know the extent. We certainly have stipulated that there are some things we may never know with certainty, but we have not stipulated ever that a reasonable jury could not conclude that these folks were on the tape in various stages of undress. Indeed, we have argued forcefully that that is highly likely. And an appropriate issue for the jury. Thank you. Thank you very much, Your Honor. Thank you. The case is argued. We'll stand submitted. We'll next hear argument in Ide v. Alaska Airlines.
judges: Kozinski, Smith, Otero